AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| v. | ) |
| ALEJANDRO DEJESUS TAVAREZ, | )   Case No.   5:20-MJ- 566 (TWD) |
| ALEXANDER TAVAREZ ESPINAL, and | ) |
| JAN VAZQUEZ, | ) |
| | ) |
| | ) |
| **Defendants** | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On

or about the dates of on or about August 2020 to November 3, 2020 in the county of Onondaga in the Northern

District of New York the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1), (b)(1)(B), (b)(1)(A), and 846 | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances, to wit: 100 Grams or More of a Mixture and Substance Containing Heroin, a Schedule I Controlled Substance, and 400 Grams or More of a Mixture and Substance Containing Fentanyl, a Schedule II Controlled Substance |

This criminal complaint is based on these facts:
See attached affidavit

☒ Continued on the attached sheet.

*Complainant's signature*

Daniel Babbage, Task Force Officer

*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date:   November 4, 2020

*Judge's signature*

City and State:   Syracuse, New York          Hon. Thérèse Wiley Dancks, U.S. Magistrate Judge

*Printed name and title*

### AFFIDAVIT OF DEA TASK FORCE OFFICER DANIEL BABBAGE

Daniel Babbage, being duly sworn, deposes and says:

## I. INTRODUCTION

1.   I am a public servant of the kind specified in the New York State CPL 690.05(1), my title being a Police Officer.  I have been a sworn member of the Syracuse Police Department since November 1995.  I am currently assigned to the United States Department of Justice, Drug Enforcement Administration (DEA) Syracuse Resident Office as a Task Force Officer.  I have been a sworn member of the DEA Syracuse Resident Office Task Force since November 2019. As such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 21 United States Code, Section 801, et seq. and Title 18, United States Code, Section 2516.  I have attended   the   following   trainings/schools:   DEA   Basic   Narcotics   School,   DEA Supervisor/Leadership School, Interview & Interrogation School, Highway/ Transit Drug Interdiction School, Instructor Development School, Dignitary/Executive Protection School, Firearms Instructor School, Basic SWAT/Hostage Rescue School & Basic Explosive Breacher Course. I have participated in numerous successful investigations into illicit drug distribution networks and have interrogated numerous defendants, informants and others who were either sellers, distributors, or users of narcotics and other illicit drugs.  Also, I have been involved in the monitoring, intercepting and recording of court-ordered wiretaps, and have participated in numerous search warrants/arrest warrants involving narcotics trafficking.  In addition to my above-mentioned experience, I have had the opportunity to speak with and observe other federal, state

and city narcotics officers with regard to the manner in which narcotics are possessed, sold, and distributed in the Syracuse, NY area.

2.   I have participated in numerous searches of residences, businesses and vehicles in which controlled substances, drug paraphernalia, currency, and records were discovered.  My experience as well as conversations with other law enforcement officers, as detailed herein, will serve as the basis for any opinions or conclusions set forth below.  I have personally participated in the investigation of the offenses set forth below and as a result of my participation and my review of past and present reports made by other Special Agents of the DEA, and other state and local law enforcement agencies, I am fully familiar with the facts and circumstances of this investigation.  I have participated in several multi-agency narcotics investigations.  During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, execution of search warrants, debriefings of informants, and reviews of tape-recorded conversations and narcotics records.  Among other duties, I am now responsible for an investigation relating to the distribution of heroin and other controlled substances by **ALEJANDRO DEJESUS TAVAREZ, ALEXANDER TAVAREZ ESPINAL, JAN VAZQUEZ,** and others known and unknown.

3.   I submit this affidavit in support of a criminal complaint charging defendants **ALEJANDRO DEJESUS TAVAREZ, ALEXANDER TAVAREZ ESPINAL** and **JAN VAZQUEZ** with conspiracy to distribute and possess with intent to distribute controlled substances, to wit: heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), and 846. I further allege that there is probable cause to believe the offense involved 400 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A) and 100 grams or more of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(B).

4.   During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, execution of search warrants, debriefings of informants, and reviews of tape-recorded conversations and narcotics records.

5.   I have personally participated in the investigation of the offenses set forth below, which relate to the trafficking of heroin.  As a result of my participation in this investigation, my conversations with Special Agents of the DEA, agents, officers and investigators of other state and local law enforcement agencies, and my review of past and present reports made by others agents, officers, and investigators, I am fully familiar with the facts, circumstances, and subjects of this investigation.  My experience in the investigation of narcotics crimes, as well as my participation in the instant investigation, and conversations with other law enforcement officers, will serve as the basis for any opinions or conclusions set forth below.

## II. <u>BASIS OF INFORMATION</u>

6.   As this affidavit is being submitted for the limited purpose of providing probable cause to support charging **ALEJANDRO DEJESUS TAVAREZ** and **ALEXANDER TAVAREZ ESPINAL**, and **JAN VAZQUEZ** with conspiracy to distribute and possess with intent to distribute controlled substances, I have not included each and every fact known to me concerning this investigation.  I set forth only the facts which I believe are necessary to establish probable cause for the issuing of a criminal complaint.

7.   The investigation to date has included several controlled purchases of heroin, extensive telephone toll analysis, pen registers, physical surveillance operations, monitoring and recording of pole cameras, monitoring of global positioning devices, GPS tracking warrants, narcotics and narcotics proceeds, and wire and electronic interceptions of the following cellular telephones: xxx-xxx-1847 (SUBJECT TELEPHONE #4) and (xxx) xxx-5006 (SUBJECT TELEPHONE #5), both

3

utilized by **ALEJANDRO DEJESUS TAVAREZ.** These investigative steps have revealed that **ALEJANDRO DEJESUS TAVAREZ, ALEXANDER TAVAREZ ESPINAL**, and **JAN VAZQUEZ** have been working together, as co-conspirators, in furtherance of the DTO.

8.   During the course of this investigation, as described in part below, law enforcement has identified **ALEJANDRO DEJESUS TAVAREZ** as the user of SUBJECT TELEPHONES #4 and #5 through physical surveillance and corresponding intercepted calls.  In addition, based on my work in this case, I now recognize **ALEJANDRO DEJESUS TAVAREZ'S** voice and can confirm it is him speaking where indicated in the calls quoted in this complaint.  Similarly, I have personally observed **Alexander TAVAREZ ESPINAL** engaged in apparent drug-related activity, some of which is described below.  Law enforcement has also intercepted calls during this investigation where it is apparent that **Alexander TAVAREZ ESPINAL** is the one speaking because surveillance identified him as the person engaged in certain conduct described in those calls (e.g. arriving at an agreed-upon location at an agreed-upon time).  Based on those interceptions, I can now recognize **Alexander TAVAREZ ESPINAL's** voice and have confirmed that he is the one speaking in the calls quoted below.  In addition, law enforcement has observed **JAN VAZQUEZ** involved in apparent drug trafficking activity in connection with this DTO on a number of occasions during the course of this investigation, some of which is described below.

**III.** **PROBABLE CAUSE**

9.   On August 30, 2020, at approximately 11:28 AM, an outgoing telephone call (Call #2135) was intercepted between Co-conspirator 1 (CC#1) and **ALEJANDRO DEJESUS TAVAREZ** utilizing SUBJECT TELEPHONE #4.  The following is a transcript of the conversation:

ALEJANDRO:          Hello?

CC#1:          Yo, what up, Pop?

ALEJANDRO:          Two more?

CC#1:                       I'm trying to get 10.

ALEJANDRO:          Aight.

CC#1:                       Aight.

[End of call]

10. Based on my training, experience and knowledge of this investigation, I believe that CC#1 was arranging to purchase 10 "bricks[1]" (500 bags) of heroin from **ALEJANDRO DEJESUS TAVAREZ**.

11. Roughly twelve minutes after this call, at approximately 11:40 AM, I observed **Alexander TAVAREZ ESPINAL** driving a blue Honda Odyssey (hereinafter the Honda Odyssey) at a location in Syracuse, NY.  A DMV records check of that vehicle revealed that the Honda Odyssey was registered to A.A TAVAREZ ESPINAL of Syracuse, NY.  At approximately 11:45 AM, I followed **Alexander TAVAREZ ESPINAL** to the parking lot of an apartment building on East James Street, Syracuse, NY (hereinafter, the East James Street Location).

12. At approximately 11:47 AM, a call (Call #2144) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ**, utilizing SUBJECT TELEPHONE #4.  The following is a transcript of that conversation:

CC#1:                       Hello?

ALEJANDRO:          Yo.

CC#1:                       He said what? He be here in what?

[Voice Overlap]

---

[1] A "brick" of heroin consists of five (5) "bundles," with each "bundle" containing ten (10) individual glassine bags of heroin. Thus, a "brick" contains fifty (50) individual glassine bags of heroin.

ALEJANDRO:          He'll be there in five minutes.

CC#1:               Aight.

ALEJANDRO:          Five minutes

13. Based on my training, experience and knowledge of this investigation I believe that when **ALEJANDRO DEJESUS TAVAREZ** said that "he'll be there in 5 minutes," he was referring to **Alexander TAVAREZ ESPINAL**.  At approximately 11:47 AM surveillance observed **Alexander TAVAREZ ESPINAL** pull out of the East James Street Location driving the Honda Odyssey.  Surveillance observed **Alexander TAVAREZ ESPINAL** travel to the parking lot of an apartment building in Syracuse.  At approximately 11:55 AM, surveillance observed CC#1 driving a vehicle (hereinafter, the CC#1 Vehicle) pull into the same parking lot.  At around that same time, approximately 11:55 AM, a call (Call #2149) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ**, using SUBJECT TELEPHONE #4.  The following is a transcript of that conversation:

CC#1:               I'm pulling there now.

ALEJANDRO:          He there, ma.

CC#1:               Aight.

[End of call]

14. Based on my training, experience and knowledge of this investigation, I believe **ALEJANDRO DEJESUS TAVAREZ** was telling CC#1 that **Alexander TAVAREZ ESPINAL** was at the pre-arranged location where CC#1 and **ALEJANDRO DEJESUS TAVAREZ** had agreed to meet to conduct the drug transaction. At approximately 11:56 AM, surveillance observed **Alexander TAVAREZ ESPINAL** driving the Honda Odyssey pull into that location and park next to CC#1.  **Alexander TAVAREZ ESPINAL** parked so that his driver's window was only a

few inches away from CC#1's driver's window.  Because of the vantage point, surveillance could not specifically observe **Alexander TAVAREZ ESPINAL** and CC#1 engage in a hand-to-hand transaction, but based on their proximity to one another, I believe that **Alexander TAVAREZ ESPINAL** gave heroin to CC#1 when he parked next to CC#1.   At approximately 12:01 PM, surveillance observed **Alexander TAVAREZ ESPINAL** leave the parking lot driving the Honda Odyssey.  CC#1 remained in his/her vehicle and appeared to be looking down in his/her lap, doing something with his/her hands.  I believe CC#1 was sitting in his/her vehicle processing the heroin for customers that were waiting.

15. On September 1, 2020, at approximately 1:34 PM, an outgoing call (Call #3209) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ**, utilizing SUBJECT TELEPHONE #4.  The following is a transcript of the conversation:

ALEJANDRO:          Hello.

CC#1:               Yo pa, I just [Pause] I get four real quick.

ALEJANDRO:          How much?

CC#1:               Four, yeah.

ALEJANDRO:          Four?

CC#1:               Yeah, real quick, yeah.

[Voices Overlap]

ALEJANDRO:          Aight. Aight. Um Seeley?

CC#1:               Yeah, I'm right around the corner.

ALEJANDRO:          Aight.

CC#1:               Aight.

[End of Call]

7

16. Roughly fifteen minutes later, at approximately 1:50 PM, I observed the same Honda Odyssey described above arrive at the east side of the agreed-upon location.  I identified the driver of the Honda Odyssey as **Alexander TAVAREZ ESPINAL**.

17. Roughly three minutes later, at approximately 1:53 PM, an outgoing call (Call #3247) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ**, utilizing SUBJECT TELEPHONE #4.  The following is a transcript of the conversation:

ALEJANDRO:       Hello.

CC#1:            Yeah, he here?

ALEJANDRO:       Yeah mama, I bet he waiting for you.

CC#1:            [Audio Breaks] He here?

ALEJANDRO:       Yeah.

CC#1:            Okay, I'm right here.

[End of Call]

18. Roughly two minutes later, at approximately 1:55 PM, surveillance observed the CC#1 Vehicle, pull into the parking lot of the agreed-upon location and park next to the Honda Odyssey. I identified the driver of the CC#1 Vehicle as CC#1.  Surveillance observed CC#1 exit the CC#1 Vehicle and enter the front seat of the Honda Odyssey van. A few seconds later, surveillance observed CC#1 exit the Honda Odyssey and return to the CC#1 Vehicle.  Both the Honda Odyssey and the CC#1 Vehicle left the area.

19. Based on my training and experience, I believe that CC#1 contacted **ALEJANDRO DEJESUS TAVAREZ** to purchase heroin, and **Alexander TAVAREZ ESPINAL** delivered the heroin to CC#1.

20. On September 3, 2020, at approximately 12:26 PM, an outgoing call (Call #5006) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ**, utilizing SUBJECT TELEPHONE #4.  The following is a transcript of the conversation:

ALEJANDRO:          What's up, ma?

[Voices Overlap]

CC#1:                       Yo. Yeah pa, I need sixty of 'em.

ALEJANDRO:          How much?

CC#1:                       Sixty.

ALEJANDRO:          Aight. The same place?

CC#1:                       Yeah.

ALEJANDRO:          Aight.

CC#1:                       Aight.

[End of Call]

21. Roughly one minute later, at approximately 12:27 PM, an incoming call (Call #5008) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ** utilizing SUBJECT TELEPHONE #4.  The following is transcript of the conversation:

CC#1:                       Hello.

ALEJANDRO:          Yeah ma, you said sixteen or sixty?

CC#1:                       Sixty.

ALEJANDRO:          Aight.

CC#1:                       Alright.

[End of Call]

22. At approximately 12:46 PM, surveillance observed CC#1 exit the rear door of an apartment complex and enter the CC#1 Vehicle.   Surveillance then observed CC#1 meet with an individual in the parking lot of a restaurant where CC#1 appeared to engage in a hand-to-hand drug transaction with an unknown white female.  CC#1 left the area and was followed by surveillance. CC#1 then drove to the agreed-upon location in Syracuse, NY.  At approximately 12:47 PM, surveillance observed **Alexander TAVAREZ ESPINAL's** Honda Odyssey at the East James Street Location.  Surveillance then observed **Alexander TAVAREZ ESPINAL** exit the vehicle and enter the apartment building.  At approximately 12:59 PM, surveillance observed **Alexander TAVAREZ ESPINAL** exit the apartment building, enter the Honda Odyssey and leave the area. At approximately 1:06 PM, I observed **Alexander TAVAREZ ESPINAL**, driving the Honda Odyssey, arrive at the location that was agreed-upon for the drug deal and park the vehicle.

23. At approximately 1:05 PM, an incoming call (Call #5059) was intercepted between CC#1 and **ALEJANDRO DEJESUS TAVAREZ**, utilizing SUBJECT TELEPHONE #4.   The following is a transcript of the conversation:

CC#1:               Hello.

ALEJANDRO:      He there, ma.

CC#1:               Okay.

[End of Call]

24. At approximately 1:08 PM, surveillance observed CC#1 arrive at the same parking lot driving the CC#1 Vehicle. At approximately 1:09 PM, surveillance observed CC#1 exit the CC#1 Vehicle and get into the front seat passenger side of the Honda Odyssey.  At 1:11 PM, I observed CC#1 exit the Honda Odyssey clutching a brown paper bag, get into the CC#1 Vehicle and leave the area. At approximately the same time, **Alexander TAVAREZ ESPINAL** left the area as well.

25. Based on my training, experience and knowledge of this investigation, I believe that CC#1 ordered 60 bricks of heroin (3,000 bags) from **ALEJANDRO DEJESUS TAVAREZ**.  When CC#1 agreed to meet at the "same place," I believe CC#1 and **ALEJANDRO DEJESUS TAVAREZ** were referring to the location of the previously-described transactions. I believe that **Alexander TAVAREZ ESPINAL** met CC#1 there, and that the brown paper bag that CC#1 had when CC#1 left the meeting contained heroin.

26. On September 22, 2020, at approximately 12:32 PM, an incoming telephone call (call #36) was intercepted over SUBJECT TELEPHONE #5 between **ALEJANDRO DEJESUS TAVAREZ** and Co-Conspirator #2 (CC#2).  The following is a transcript from that call:

CC#2:           Hello.

ALEJANDRO:      Yo.

CC#2:           Yo, let me get ten to the circle, pa.

ALEJANDRO:      Alright.

[End of Call]

27. Based on my training, experience, and knowledge of this investigation, I believe that CC#2 contacted **ALEJANDRO DEJESUS TAVAREZ** to purchase 10 bricks of heroin and arranged to conduct the transaction in the vicinity of an apartment building in Syracuse, NY.  Around the time of the above-referenced call, GPS data on SUBJECT TELEPHONE #5 indicated that the user of the device was at a location in Auburn, NY.

28. Immediately after the above-referenced call, on September 22, 2020, at approximately 12:32 PM, an outgoing telephone call (call #40) was intercepted over SUBJECT TELEPHONE #5 from **ALEJANDRO DEJESUS TAVAREZ** to xxx-xxx-9001, a phone number believed to be used by **Alexander TAVAREZ ESPINAL**.  At times during the call, a second unidentified male

(UM2) can be heard speaking on xxx-xxx-9001.  The call was in Spanish.  The following is a transcript of an English translation of that call:

| | |
|---|---|
| ALEXANDER: | [Aside: [Unintelligible]]. Yo. |
| ALEJANDRO: | Huh? |
| ALEXANDER: | Yo. |
| ALEJANDRO: | Yo, you hear me? |
| ALEXANDER: | Huh? |
| ALEJANDRO: | The son needs 10 at the circle. |
| UM2: | Brother. |
| ALEJANDRO: | Yo. |
| UM2: | Yo, brother! |
| ALEJANDRO: | Are you awake? |
| UM2: | Of course brother. Hey, bring, bring three spaghettis please. |
| ALEJANDRO: | [Laughs]. |
| UM2: | If not, don't show up. |
| ALEJANDRO: | [Mumbles]. |
| UM2: | One for me, one for Junior and one for Torito. You heard? |
| ALEJANDRO: | Um-hum. Alright. |
| UM2: | Please. So what happened? Who called? |
| ALEJANDRO: | The son. He need ten. |
| UM2: | Ten? Perfect. |
| ALEJANDRO: | At the circle. |
| UM2: | Thank you very much. And wake up. The only thing you do in bed is grow eyes buggers. |
| ALEJANDRO: | Dude, I just woke up. The son woke me up. |
| UM2: | Okay, brother. |

[End of Call]

29. Based on my training and experience in this investigation, I believe that when **ALEJANDRO DEJESUS TAVAREZ** said "the son needs ten at the circle," he was informing **Alexander TAVAREZ ESPINAL** and UM2 to deliver ten bricks of heroin to CC#2.

30. Roughly twelve minutes later, on September 22, 2020, at approximately 12:44 PM, an incoming telephone call (call #41) was intercepted over SUBJECT TELEPHONE #5 to **ALEJANDRO DEJESUS TAVAREZ** from **Alexander TAVAREZ ESPINAL**, who was using xxx-xxx-9001.  The call was in Spanish. The following is a transcript of the English translation from that call:

ALEXANDER:        I'm coming in.

ALEJANDRO:        Alright.

[End of Call]

31. Based on my training and experience in this investigation, I believe that this call was a follow-up to the prior conversations, and **Alexander TAVAREZ ESPINAL** was informing **ALEJANDRO DEJESUS TAVAREZ** that he was arriving at the agreed-upon location to conduct the drug transaction with CC#2.

32. Almost immediately after the above-referenced call, on September 22, 2020, at approximately 12:44 PM, an outgoing telephone call (call #42) was intercepted over SUBJECT TELEPHONE #5 from **ALEJANDRO DEJESUS TAVAREZ** to CC#2. The following is a transcript from that call:

CC#2:             Yo, what up, pa?

ALEJANDRO:        He there, pa.

CC#2:             Alright.

[End of Call]

33. Based on my training and experience in this investigation, I believe that **ALEJANDRO DEJESUS TAVAREZ** was informing CC#2 that **Alexander TAVAREZ ESPINAL** had arrived at the agreed-upon location to conduct the heroin transaction.

34. Around the time of the above referenced calls, at approximately 12:44 PM, the Honda Odyssey pulled into the rear parking lot of the agreed-upon location, as witnessed by surveillance. At approximately 12:46 PM, surveillance observed **Alexander TAVAREZ ESPINAL** exit the Honda Odyssey and walk toward the rear of the location. Around the same time, CC#2 was observed by surveillance walking toward the rear of the same apartment building.   At approximately 12:49 PM, CC#2 exited that location carrying a clear knotted plastic bag. A short time after, **Alexander TAVAREZ ESPINAL's** blue Honda Odyssey was observed by surveillance exiting the parking lot.

35. Based on my training, experience, and knowledge of this investigation, I believe that **Alexander TAVAREZ ESPINAL** met with CC#2 to complete the drug transaction that **ALEJANDRO DEJESUS TAVAREZ** had arranged with CC#2 in the telephone calls referenced above.

36. On October 19, 2020, at approximately 12:23 PM, an incoming telephone call (call #4215) was intercepted over SUBJECT TELEPHONE #5 between an unknown male and Co-Conspirator #4 (CC#4).  During the course of this investigation, SUBJECT TELEPHONE #5 has been used primarily by **ALEJANDRO DEJESUS TAVAREZ**.  On other occasions, another unknown male has answered the phone to arrange drug transactions. The following is a transcript from that call:

UM:           Yo.

CC#4:         What up, pa?  Let me get 30.

UM:            Give me twe...uh...20 minutes.

CC#4:          Aight. We at the circle.

[Voice Overlap]

UM:            At the laundry....You can't go to Seeley, pa?

CC#4:          Yeah, I'll call you when I get there. Twenty minutes, right?

UM:            Twenty minutes, yeah.

CC#4:          Aight.

[End of call]

37. Roughly forty minutes later, on October 19, 2020, at approximately 1:03 PM, an incoming telephone call (call #4220) was intercepted over SUBJECT TELEPHONE #5 between an unknown male and CC#4. The following is a transcript from that call:

UM:            Yo.

CC#4:          I'm here.

UM:            I'm almost there, bro.  I'm on my way.

CC#4:          Aight.

UM:            Aight.

[End of call]

38. In close proximity to the aforementioned telephone call, surveillance observed a vehicle (the CC#4 Vehicle) pull into a parking lot in Syracuse, NY.  During this investigation, CC#4 has been observed a number of times operating the CC#4 Vehicle.

39. Roughly two minutes after the above-referenced call, at approximately 1:05 PM, surveillance observed a White Infiniti with a Pennsylvania license plate (hereinafter, the White Infiniti) depart the East James Street Location.  Although law enforcement could not positively

identify the driver of the White Infiniti at that time, as explained in more detail below, law enforcement subsequently positively identified **Jan VAZQUEZ** as the operator of the White Infiniti.

40. At approximately 1:11 PM, surveillance observed the White Infiniti pull into the parking lot where the CC#4 Vehicle was parked and park in close proximity to the CC#4 Vehicle. A short time after, surveillance observed a black male exit the CC#4 Vehicle and enter the passenger door of the White Infiniti. Although surveillance could not see the face of the black male driving the white Ford Edge, CC#4 has been seen a number of times in the past driving that vehicle.  A short time after, surveillance observed the black male exit the passenger door of the White Infiniti, and enter the CC#4 Vehicle. Both vehicles then departed the area.

41. Based on my training, experience, and knowledge of this investigation, I believe CC#4 contacted SUBJECT TELEPHONE #5 to arrange a purchase of 30 bricks of heroin.  I believe that **Jan VAZQUEZ** drove the White Infiniti to obtain heroin from the East James Street Location and delivered that heroin to CC#4.

42. On October 26, 2020, at approximately 12:36 PM, a telephone call (call #3056) was intercepted from CC#2 to **ALEJANDRO DEJESUS TAVAREZ**, who was using SUBJECT TELEPHONE #5. The following is a transcript from that call:

CC#2:           Yo, Pa.

ALEJANDRO:      What up, Pa?

CC#2:           Let me get twenty to Seeley.

ALEJANDRO:      Twenty?

CC#2:           Yeah.

ALEJANDRO:      Aight. Give me like 10 or 15 minutes.

CC#2:           Aight.

16

[End of call]

43. Based on my training and experience in this investigation, I believe that CC#2 called **ALEJANDRO DEJESUS TAVAREZ** to obtain twenty bricks of heroin.

44. At approximately 12:41 PM, surveillance observed **ALEJANDRO DEJESUS TAVAREZ** enter a gray Dodge Ram (hereinafter, the Gray Dodge Ram) at a location in Syracuse. According to DMV records, the Gray Dodge Ram is registered to Alejandro D. TAVAREZ of Syracuse, NY.  Roughly one half hour later, at approximately 1:06 PM, the Gray Dodge Ram was observed by surveillance pulling into a parking lot in Syracuse.  Surveillance then observed another vehicle (hereafter, the CC#2 Vehicle) pull into a parking spot next to the Gray Dodge Ram.  During the course of this investigation, law enforcement has repeatedly observed CC#2 operating the CC#2 Vehicle.  Approximately one minute later, the CC#2 Vehicle left the area.  Shortly thereafter, surveillance observed **ALEJANDRO DEJESUS TAVAREZ** exit the Gray Dodge Ram.

45. Based on my training, experience, and knowledge of this investigation, I believe that **ALEJANDRO DEJESUS TAVAREZ** met with CC#2 to conduct a heroin transaction.

46. On October 28, 2020, at approximately 10:58 AM, an outgoing telephone call (call #5009) was intercepted between **ALEJANDRO DEJESUS TAVAREZ** utilizing SUBJECT TELEPHONE #5 and Co-Conspirator #3 (CC#3).  The following is a transcript from that call:

CC#3:              Yo.

ALEJANDRO:        What up, pa?

CC#3:              Yo, you got more of the blue ones?

ALEJANDRO:        Uh?

CC#3:              You got more of the blue?

ALEJANDRO:        Yo, pa that shit is the same thing as the blue.

CC#3:              Oh, same thing?

ALEJANDRO:          Yeah.

CC#3:               Mmm. Let me get 10.

ALEJANDRO:          Give me like [Stammers] half an hour.

CC#3:               Aight.

ALEJANDRO:          Aight.

[End of call]

47. At approximately 11:20 AM, surveillance observed that the Gray Dodge Ram was parked in front of a location on West Street in Auburn, NY. At approximately that time, **ALEJANDRO DEJESUS TAVAREZ** exited the West Street residence and entered the Gray Dodge Ram.  At approximately 12:23 PM, surveillance observed the Gray Dodge Ram park at a location in Syracuse, NY.  At approximately 12:31 PM, surveillance observed another vehicle arrive, CC#3 exited that vehicle, and got into the front passenger seat of the Gray Dodge Ram.  After a short period, surveillance observed CC#3 exit the Gray Dodge Ram and return to his/her vehicle.  Both vehicles then left the area.  Surveillance units followed the Gray Dodge Ram to a barber shop in the Syracuse area.  Surveillance then observed **ALEJANDRO DEJESUS TAVAREZ** exit the Gray Dodge Ram and walk into the barber shop.

48. Based on my training and experience in this investigation, I believe that **ALEJANDRO DEJESUS TAVAREZ** met with CC#3 to sell CC#3 a quantity of heroin.  When CC#3 asked in the above-quoted call whether **ALEJANDRO DEJESUS TAVAREZ** had any of the "blue," CC#3 was referring to a particular "batch" of heroin that had been packaged in blue glassine bags. I know from my training and experience that heroin traffickers frequently "brand" their product by placing them in bags with particular colors or stamps.

49. On October 30, 2020, at approximately 1:13 AM, I received a LPR notification from the New York State Intelligence Center advising that the White Infiniti was traveling northbound on

I-81 in the vicinity of Binghamton, NY.  At approximately 2:42 AM, surveillance observed the White Infiniti arrive at the East James Street Location. At approximately 2:44 AM, surveillance observed a male exit the driver's seat of the White Infiniti and enter the building at the East James Street Location.  Surveillance was not able to identify the male's face during that surveillance, but two days later, on November 1, 2020, law enforcement positively identified **JAN VAZQUEZ** driving the White Infiniti.  Based on my training and experience, I believe that **JAN VAZQUEZ** obtained a quantity of heroin from a location in Pennsylvania, and then brought the drugs to the DTO's stash location at the East James Street Location.

50. Since March 2020, the White Infiniti has been captured at least 43 times by automated License Plate Readers ("LPR") along Interstate 81 in the area of Binghamton, NY.  The vehicle has been observed going both northbound and southbound, in patterns that suggest nearly 30 round trips.  The trips appear to be an average stay in Syracuse between one to five days. The LPR south of Binghamton, NY would appear the route traveled to get from Syracuse, NY to Pennsylvania. Based on my training, experience, and knowledge of this investigation, I know that the Pennsylvania region is a common source of supply region for narcotic traffickers operating within the Syracuse, NY region. As referenced above, **JAN VAZQUEZ** has been observed in this investigation operating the White Infiniti.  Based on my training, experience, and knowledge of this investigation, in conjunction with frequent travel patterns involving the White Infiniti to and from Syracuse, NY, and surveillances involving the White Infiniti where the White Infiniti is conducting narcotic transactions; I believe that **JAN VAZQUEZ** is using the White Infiniti to engage in drug trafficking .

51. On November 3, 2020, law enforcement executed federal search warrants at a number of locations and for a number of vehicles.  Among those was a specific apartment at the East James

Street Location that had been identified as used by the DTO as a possible stash location. Officers made entry to the target apartment and found **ALEJANDRO DEJESUS TAVAREZ** and **JAN VAZQUEZ** inside the apartment. The apartment consists of a living room with an open kitchen, and a hallway that leads to two bedrooms. In one of the bedrooms, officers located a large-scale heroin and fentanyl processing operation. This included approximately 900 grams of a substance that field tested positive for the presence of fentanyl; approximately 500 grams of a substance that field tested positive for the presence of heroin; approximately 5,300 glassine bags, each containing a substance, a sample of which field tested positive for the presence of heroin; and approximately 6,000 loose glassine baggies each containing a substance, a sample of which field tested positive for heroin. In the same room, officers also located multiple grinders, strainers, scales, plastic baggies, rubber bands, seven cases of empty bags (approximately 170,000 bags), a money counter, and a vacuum sealer. Officers also located a large sum of US currency. The room had processing material located on two tables with two chairs, indicating that two individuals were processing the heroin/fentanyl.

52. Parked in front of the East James Street Residence were the Gray Dodge Ram and the White Infiniti. Pursuant to a federal search warrant, officers searched the White Infiniti and found a number of paperwork items in the name of **JAN VAZQUEZ**, such as Western Union receipts and two Turning Stone rewards cards.

53. Officers also executed a search warrant at an apartment on Butternut Street in Syracuse that officers had identified as **ALEXANDER TAVAREZ ESPINAL's** residence. During the investigation, officers had regularly observed **ALEXANDER TAVAREZ ESPINAL** coming and going from that location in a manner indicating that it was his residence. When officers executed the search warrant, **ALEXANDER TAVAREZ ESPINAL** was not there, but a woman who

identified herself as his girlfriend was present.  Officers located various evidence indicating that **ALEXANDER TAVAREZ ESPINAL** lived at the residence, including finding his passport, and various receipts and mail in his name. In addition, the Honda Odyssey was parked in front of the Butternut Street residence.  As described above, **ALEXANDER TAVAREZ ESPINAL** has been observed repeatedly during this investigation operating the Honda Odyssey.

54. Officers also located on a chair in the dining room area approximately 226.1 grams of a substance that field tested positive for fentanyl that was packaged inside baggies that were vacuum sealed together; approximately 45.1 grams of a substance that field tested positive for fentanyl inside loose plastic baggies; approximately 1,550 glassine envelopes marked with a blue star that each contained a substance, a sample of which field tested positive for the presence of heroin; and a cardboard box containing miscellaneous heroin/fentanyl processing paraphernalia, including blenders, baggies, envelopes, strainers, stamps and rubber bands.

## IV. CONCLUSION

55. I believe the foregoing establishes probable cause to believe that defendants **ALEJANDRO DEJESUS TAVAREZ, ALEXANDER TAVAREZ ESPINAL,** and **JAN VAZQUEZ** conspired with each other and others to distribute and possess with intent to distribute controlled substances, to wit: heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I further allege that there is probable cause to believe the offense involved 400 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(A), and 100 grams or more of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(B).  I respectfully request that the Court authorize the filing of this complaint so that the defendants may be charged and

brought to court for further proceedings in accordance with the law.

ATTESTED TO BY THE APPLICANT IN ACCORDANCE WITH THE

REQUIREMENTS OF RULE 4.1 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Daniel Babbage, Task Force Officer
Drug Enforcement Administration

I, the Honorable Thérèse Wiley Dancks, United States Magistrate Judge, hereby acknowledge
that this affidavit was attested by the affiant by telephone on November 4, 2020, in accordance
with Rule 4.1 of the Federal Rules of Criminal Procedure.

Hon. Thérèse Wiley Dancks
United States Magistrate Judge